# United States Court of Appeals

## For the First Circuit

No. 02-2494

MARTIN J. MULVIHILL,

Plaintiff, Appellant,

v.

THE TOP-FLITE GOLF COMPANY, F/K/A
SPALDING SPORTS WORLDWIDE, INC., ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor,  U.S. District Judge]

Before

Selya, Circuit Judge,
Coffin and Porfilio,* Senior Circuit Judges.

Edward J. McDonough, Jr., with whom Egan, Flanagan and Cohen,
P.C. was on brief, for appellant.
Jay M. Presser, with whom Skoler, Abbott & Presser, P.C. was
on brief, for appellee Spalding Sports Worldwide, Inc.
G. Gordon Atcheson, with whom Blake & Uhlig, P.A. was on
brief, for appellee Int'l Bhd. of Boilermakers, Etc., Local 1851.

July 2, 2003

_____

*Of the Tenth Circuit, sitting by designation.

**SELYA**, **Circuit Judge**.  Having become convinced that Spalding Sports Worldwide, Inc. (Spalding) had terminated his employment without proper cause,[1] plaintiff-appellant Martin J. Mulvihill asked his union — Local 1851 of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers (the Union) — to prosecute a grievance against Spalding pursuant to the collective bargaining agreement then in effect (the CBA).  The Union did so.  But when Spalding rejected the grievance, the Union refused to bring the matter to arbitration.

Mulvihill subsequently brought suit in the United States District Court for the District of Massachusetts against Spalding and the Union.  In due course, the district court granted summary judgment in favor of both defendants.  Mulvihill appeals.  Concluding, as we do, that Spalding acted with proper cause, we affirm the judgment below.

**I.  BACKGROUND**

We present the facts derived from the record in the light most favorable to the party opposing summary judgment (here, the plaintiff).  See Plumley v. S. Container, Inc., 303 F.3d 364, 367 (1st Cir. 2002).

---

[1]By virtue of certain corporate transactions not relevant here, Spalding is now known as The Top-Flite Golf Company.

Mulvihill began his tour of duty at Spalding in 1969. At the times material hereto, a CBA was in effect between Spalding and the Union. The CBA included a management rights provision, which stated, inter alia, that Spalding would "continue to direct working forces, including the right to . . . discharge [employees] for proper cause." The CBA also mapped out a standard grievance mechanism. Under it, an offended employee could lodge a grievance with a Union-organized committee and expect the grievance committee to press Spalding to resolve the complaint. If that failed, the Union had the right to compel Spalding to proceed to binding arbitration.

Mulvihill, a long-time Union member, held a job within the bargaining unit. In 2000, a coworker, Amy Charest, accused him of sexual harassment. Acting on Charest's formal complaint, Spalding conducted an investigation. The results of that probe led it to terminate Mulvihill's employment. Contending that Spalding had discharged him without proper cause, Mulvihill submitted a grievance.

Buoyed by Mulvihill's thirty-two years of service, the Union's grievance committee lobbied Spalding to reconsider its decision, reinstate Mulvihill, and award him back pay. The main thrust of the Union's argument was that discharge was "too serious" a remedy for the asserted misconduct. Spalding rejected the

Union's importunings, pointing to Charest's complaint and the results of its investigation.

In her complaint, Charest had accused Mulvihill of: spreading "false rumors" within the company to the effect that she was "having an affair" with a fellow employee named Mike Rattell; telling Rattell's wife — who also worked for Spalding — about the alleged affair; "interfering with [Charest's] personal life" and making her feel "violated"; and creating a situation in which Charest found it "emotionally and physically . . . hard [to] concentrat[e] on [her] work." Spalding's investigation into these remonstrances revealed the following undisputed facts. On September 7, 2000, Charest's husband, Todd, had gone to Mulvihill's home on matters unrelated to this dispute. The two discussed Charest's putative involvement in a sexual relationship with Rattell and Mulvihill agreed to give Todd Charest's telephone number to Rattell's wife (Melissa) so that she could contact him regarding their spouses' suspected infidelity. Mulvihill passed the telephone number to Melissa Rattell at work the following day. He proceeded to tell two other Spalding employees (Domenic Montessi and Ray Perreault) about the alleged affair. According to them, he supplied graphic detail.

Spalding's sexual harassment policy prohibits "sexual discrimination or harassment which undermines the employment relationship by creating an intimidating, hostile, and offensive

-4-

work environment." The policy specifically defines verbal harassment to include "spreading rumors about a coworker's sex life" and forbids any such conduct that may "unreasonably interfere[] with an employee's work performance." The executive in charge of the investigation, Robert Bourdeau, concluded that Mulvihill's behavior transgressed the policy and created a working environment that Charest reasonably found offensive. After consulting with senior management, Bourdeau terminated Mulvihill's employment.

As said, the Union initially processed a grievance on Mulvihill's behalf. When Spalding resisted, the Union accepted Spalding's response, ignored Mulvihill's protests, and allowed the matter to die on the vine. After the deadline for submitting the grievance to arbitration had passed, Mulvihill filed suit against Spalding and the Union. His complaint asserted, inter alia, that (1) Spalding had violated section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, by cashiering him without proper cause (in derogation of the CBA), and (2) the Union had failed to heed its duty fairly to represent him with respect to Spalding's breach.

This sort of double-barreled suit is known as a hybrid section 301 action. See, e.g., Arriaga-Zayas v. Int'l Ladies' Garment Workers' Union, 835 F.2d 11, 12 (1st Cir. 1987). While it is composed of two causes of action — one against the employer and

the other against the union — the claims are inextricably intertwined. See DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 164-65 (1983). This imbrication is underscored by the fact that in order to prevail against either defendant, the employee must establish that the employer breached the CBA. Id. at 165.

The district court determined, at the summary judgment stage, that Spalding had acted with proper cause in discharging Mulvihill (and, therefore, had not breached the CBA). On this basis, the court disposed of the section 301 claims. Mulvihill also had asserted a defamation claim, and the court found that claim wanting as well. This appeal ensued.

## II. ANALYSIS

We begin our analysis with a reiteration of the by-now-familiar summary judgment standard. We then provide an overview of the interaction between hybrid section 301 actions and Title VII. Finally, we turn to the merits of Mulvihill's claims.

### A. **The Summary Judgment Standard**.

The role of summary judgment is to look behind the facade erected by the pleadings and assay the parties' proof in order to determine whether a trial will serve any useful purpose. Plumley, 303 F.3d at 368. Conventional summary judgment practice requires the moving party to assert the absence of a genuine issue of material fact and then support that assertion by affidavits, admissions, or other materials of evidentiary quality. Quintero de

Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992).
Once the movant has done its part, the burden shifts to the summary
judgment target to demonstrate that a trialworthy issue exists.
Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000).
When all is said and done, summary judgment will lie only if the
"pleadings, depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any, show that there is
no genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56(c).

In conducting this tamisage, the district court must
scrutinize the record in the light most flattering to the party
opposing the motion, indulging all reasonable inferences in that
party's favor.  Morris v. Gov't Dev. Bank, 27 F.3d 746, 748 (1st
Cir. 1994).  This standard is notoriously liberal — but its
liberality does not relieve the nonmovant of the burden of
producing specific facts sufficient to deflect the swing of the
summary judgment scythe.  Id.  Moreover, the factual conflicts
relied upon by the nonmovant must be both genuine and material.
See Fed. R. Civ. P. 56(c).  For this purpose, "genuine" means that
the evidence is such that a reasonable factfinder could resolve the
point in favor of the nonmoving party, and "material" means that
the fact is one that might affect the outcome of the suit under the
applicable law.  Morris, 27 F.3d at 748.

-7-

This same paradigm governs our de novo review of a district court's summary judgment rulings. Plumley, 303 F.3d at 369. There is, however, one important distinction. The court of appeals "is not restricted to the district court's reasoning but can affirm a summary judgment on any independently sufficient ground" made manifest in the record. Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991).

### B. **The Governing Law**.

Federal common law supplies the substantive rules for adjudicating interlocked claims against an employer and a trade union for breach of a CBA. See Crider v. Spectrulite Consortium, Inc., 130 F.3d 1238, 1242 (7th Cir. 1997); see also Fant v. New Engl. Power Serv., 239 F.3d 8,14 (1st Cir. 2001) ("In creating § 301 of the LMRA, Congress intended that a comprehensive, unified, body of federal law should govern actions concerning the interpretation and enforcement of collective bargaining agreements.") (internal quotation marks omitted).

In this case, the CBA allowed Spalding to take certain personnel actions (including dismissal) for "proper cause." Spalding concluded that it had such cause and fired Mulvihill. The Union refrained from testing that conclusion through arbitration. In run-of-the-mine actions, the finality provisions of the CBA would operate to preclude judicial review of such a determination. See Abernathy v. United States Postal Serv., 740 F.2d 612, 617 (8th

Cir. 1984). But hybrid section 301 cases are fundamentally different. Because a hybrid section 301 action, by definition, involves a claim of inadequate union representation, the employer's determination can be overcome if the claimant can show, inter alia, that the adverse employment action contravened the CBA. Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 567 (1976). In this way, the law opens a remedial avenue for an employee "who has been injured by both the employer's and the union's breach." Bowen v. United States Postal Serv., 459 U.S. 212, 222 (1983).

Although this remedial avenue can lead to make-whole relief, there is no guarantee of safe passage. Typically, claimants attempting to make the requisite showing in hybrid section 301 actions must carry a heavy burden. Such claimants "are not entitled to relitigate their discharge[s] merely because they offer newly discovered evidence that the charges against them were false and that they in fact were fired without [sufficient] cause." Hines, 424 U.S. at 571. Rather, such a case may proceed only if, and to the extent that, the claimant can show that the checks and balances built into the CBA's internal dispute resolution process have failed to function. See McCreedy v. Local Union No. 971, 809 F.2d 1232, 1238 (6th Cir. 1987). To reach this safe harbor, the claimant must prove an erroneous discharge, a breach of duty on the union's part, and a causal nexus between the two, that is, "that [the] union's breach of its duty 'seriously undermine[d] the

-9-

integrity of the [grievance] process.'" <u>United Parcel Serv., Inc.</u> v. <u>Mitchell</u>, 451 U.S. 56, 61 (1981) (quoting <u>Hines</u>, 424 U.S. at 567).

Let us be perfectly clear.  Proof of the required nexus does not entail a "but for" causal connection between the union's breach of duty and the erroneous discharge.  <u>Webb</u> v. <u>ABF Freight Sys., Inc.</u>, 155 F.3d 1230, 1242 (10th Cir. 1998).  It does, however, require the claimant to produce sufficient evidence from which a reasonable factfinder can conclude not only that the discharge was improper but also that the union's breach undermined the grievance process and thereby contributed to the error.  <u>See</u> <u>Thomas</u> v. <u>United Parcel Serv., Inc.</u>, 890 F.2d 909, 915 (7th Cir. 1989); <u>Apperson</u> v. <u>Fleet Carrier Corp.</u>, 879 F.2d 1344, 1355 (6th Cir. 1989); <u>see</u> <u>also</u> <u>Sear</u> v. <u>Cadillac Auto. Co. of Boston</u>, 654 F.2d 4, 7 (1st Cir. 1981) (Breyer, J.) (noting that "[t]he burden . . . upon a union member is particularly heavy if he attacks the union's failure to appeal from . . . a proceeding untainted by any union failure to represent its members in good faith").

This case follows the classic pattern for a hybrid section 301 action.  It involves an assessment of the actions of Spalding and the Union against the background understanding of "proper cause" as that term is used in the CBA.  The matter is complicated, however, because the principal allegation against Mulvihill — the charge of sexual harassment — implicates Title VII

of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17. Employee-claimants in hybrid section 301 actions that impinge upon an employer's responsibilities under Title VII must carry an especially heavy burden. That is so because the presence of Title VII transforms the case from a relatively simple two-variable equation that aspires to strike a suitable balance between an employee's rights and an employer's hegemony into a more complex three-variable analysis in which that balance must be struck while simultaneously ensuring that important federal anti-discrimination policies are honored. See Malik v. Carrier Corp., 202 F.3d 97, 106 (2d Cir. 2000).

Although the case law is sparse, we think that our conclusion as to the relative weight of the employee's burden is solidly based. Title VII "vest[s] federal courts with plenary powers to enforce the statutory requirements." Alexander v. Gardner-Denver Co., 415 U.S. 36, 47 (1974). Consequently, "an employer's investigation of a sexual harassment complaint is not a gratuitous or optional undertaking[] under federal law." Malik, 202 F.3d at 105 (citing Faragher v. City of Boca Raton, 524 U.S. 775 (1998)). To the contrary, federal law exerts considerable pressure on employers to make certain that employees refrain from sexually harassing conduct. See id. at 106; see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764 (1998) (explaining that "Title VII is designed to encourage the creation of antiharassment

-11-

policies and effective [complaint] mechanisms" for reporting harassing conduct).

Following this logic, it is evident that when sexually charged innuendo contaminates a workplace and creates an abusive environment, Title VII is violated — and the violation constitutes an unlawful employment practice. See Oncale v. Sundowner Offshore Serv. Inc., 523 U.S. 75, 78 (1998) (citing 42 U.S.C. § 2000e-2(a)(1)). But there is a rub:  the pressure to enforce Title VII is in obvious tension with the fundamental doctrine upon which employer liability under section 301 is premised — a doctrine that holds employers liable for misunderstandings between its investigators and accused employees. See Malik, 202 F.3d at 107 (explaining that "if employers must fear . . . liability based on ex post findings, they will be deterred from taking reasonable corrective action . . . as required by federal law").  Easing that tension requires courts to erect a decisional framework that allows a certain amount of play in the joints.  We pause briefly to explain.

"Congress gave private individuals a significant role in the enforcement process of Title VII." Alexander, 415 U.S. at 45. It would be counterproductive for federal courts, in whom Congress has vested "final responsibility for enforcement of Title VII," id. at 44, to insist upon de novo review of actions taken by an employer to eradicate sexual harassment in the workplace.  If

federal courts are to give effect to the antiharassment policies encouraged by Title VII, they must defer, within wide limits, both to an employer's determination that sexual harassment has sullied the workplace and to its conception of an appropriate response. Cf. Williams v. Maremont Corp., 875 F.2d 1476, 1485 (10th Cir. 1989) (applying this rationale in wrongful discharge case based on state law). The law should not require an employer, charged with responsibilities under Title VII, to wait until it is sued and found liable in a gender discrimination case before it can take steps necessary to prevent or eliminate a hostile work environment.

This brings us to the degree of deference. Because the employer in such cases vindicates the important congressional policies against discriminatory employment practices, it fulfills a quasi-administrative function. See Alexander, 415 U.S. at 47 (explaining that "legislative enactments in this area have long evinced a general intent to accord parallel or overlapping remedies against discrimination"). By analogy, then, a court should uphold the employer's actions so long as those actions are justified by substantial evidence. Cf. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) (elucidating "substantial evidence" standard); Providence Hosp. v. NLRB, 93 F.3d 1012, 1016 (1st Cir. 1996) (same). We adopt this rule for hybrid section 301 actions that implicate Title VII concerns. Thus, when an employer discharges an employee in the exercise of its Title VII responsibilities, and the

-13-

employee retorts by suing the employer and his union, we think that the vector of these competing forces requires the employee to demonstrate that the record is devoid of any substantial evidence supporting the discharge.[2]

### C.  **The Breach of Contract Claim**.

With these precepts in mind, we proceed to the merits of the case.  Mulvihill hypothesizes that Spalding discharged him without "proper cause" as that term is used in the CBA.  We test this hypothesis.

Whether the undisputed facts in a specific case establish — or fail to establish — proper cause for discharge within the contemplation of a given CBA is a question of law (and, thus, a question for the court).  Crider, 130 F.3d at 1242.  The concept of proper cause demands a close, albeit not exact, correlation between the employee's conduct and the employer's response.  Boston Med. Ctr. v. Serv. Employees Int'l Union, 260 F.3d 16, 22 (1st Cir. 2001).

In this case, the question of whether proper cause exists to sustain the employee's discharge intersects with the question of whether the record contains substantial evidence.  After all, to

---

[2]Such deference to factual determinations and interpretations of private contract disputes is consistent with federal labor law when issues of well-defined and dominant public policy are at stake.  See E. Associated Coal Corp. v. United Mine Workers, 531 U.S. 57, 62 (2000); Boston Med. Ctr. v. Serv. Employees Int'l Union, 260 F.3d 16, 23 (1st Cir. 2001).

-14-

find substantial evidence supporting the adverse employment action for Title VII purposes but not for purposes of a broadly worded management rights provision in the CBA would frustrate the legislative policies at stake. See id. at 23; see also Williams, 875 F.2d at 1485. It follows, therefore, that if Spalding's actions rested on substantial evidence, then Spalding acted with proper cause within the meaning of the CBA. Accordingly, we scrutinize the record to determine whether substantial evidence supported Spalding's conclusion that Mulvihill had engaged in sexually harassing conduct, warranting dismissal.

In sexual harassment cases, "the objective severity of harassment should be judged from the perspective of a reasonable person in the [employee]'s position considering all the circumstances." Oncale, 523 U.S. at 81 (internal quotation marks omitted). We caution, however, that Title VII was not meant to protect thin-skinned employees. The statutory scheme "forbids only behavior so objectively offensive as to alter the conditions of the victim's employment. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment . . . is beyond Title VII's purview." Id. (internal quotation marks omitted). By the same token, we caution that because the analysis requires an objective test, any subjectively benevolent or constructive intent on the part of the putative harasser will not justify a court in second-guessing the employer's decision.

-15-

Rather, "[c]ommon sense, and an appropriate sensitivity to social context" must guide the analysis. Id. at 82.

Here, substantial evidence in the summary judgment record shows that Spalding had proper cause to discharge Mulvihill. The social context in which Mulvihill's behavior occurred was an industrial workplace. Spalding had adopted an explicit sexual harassment policy, administered pursuant to Title VII and the counterpart state statute, Mass. Gen. Laws ch. 151B, § 3A(b), and had warned its work force that it took that policy seriously. Common sense suggests that a reasonable person, aware of the policy, could not have justified discussing the involvement of two coworkers in an extra-marital affair with a third-party member of the work force who had no legitimate interest in the subject matter. More importantly, from an objective standpoint Mulvihill's comments altered the conditions of Charest's employment and unreasonably interfered with her work performance. Thus, substantial record evidence provides a firm foundation for Spalding's conclusion that Mulvihill's conduct violated the company's published sexual harassment policy.

This same evidence also validates Spalding's claim that the discharge was a reasonable response to Mulvihill's misconduct. Spalding's sexual harassment policy stated unequivocally that potential punishments for violations included dismissal. The record makes manifest that once Charest filed a formal complaint,

-16-

Spalding assigned the matter to a senior officer (Bourdeau). Bourdeau promptly interviewed key witnesses to determine the veracity of the allegation that Mulvihill was telling tawdry tales. When Bourdeau afforded Mulvihill the opportunity to explain his behavior, Mulvihill did not disclaim the substance of the comments attributed to him by others. Instead, he insisted that he had acted appropriately because his discussion of the affair with Charest's husband related only to the truth of the situation (and, thus, the discussion could not constitute harassment). The tortured nature of this logic itself lends support to the employer's ultimate decision. It is bad enough when an employee acts in a sexually harassing manner; it is even worse when he cannot see the failings in his own conduct.

Based on Bourdeau's investigation, Spalding deemed termination to be the appropriate remedy. As the record contains substantial support for a finding that Mulvihill's behavior constituted sexual harassment, we have no basis to second-guess the decision to fire him. See Mesnick, 950 F.2d at 825 ("Courts may not sit as super personnel departments, assessing the merits . . . of employers' nondiscriminatory business decisions."). By like token, we cannot disturb that decision under a proper application of the substantial evidence standard. See Providence Hosp., 93 F.3d at 1016. Mulvihill's refusal to acknowledge the wrongfulness of his conduct gave Spalding all the more reason to discharge him

-17-

because there could be no assurance that Mulvihill would cease his harassing activities.  See Malik, 202 F.3d at 107 (reasoning that worst-case scenarios must govern review when employer cannot assume that harassing behavior is likely to stop).

This ends our inquiry into whether the record contains substantial evidentiary support sufficient to ground Mulvihill's discharge.  We hold that it does.  As explained above, this holding necessarily means that Spalding acted with proper cause within the purview of the CBA.  See Boston Med. Ctr., 260 F.3d at 23; Williams, 875 F.2d at 1485.

To be sure, Mulvihill resists the conclusion that Spalding had proper cause to discharge him under the terms of the CBA.  To this end, he makes a litany of arguments.  None has merit.

He starts with the strange proposition that, by embedding the "proper cause" standard in the CBA, Spalding had surrendered the right to determine the existence vel non of proper cause and left that determination to an arbitrator.  Building on this shaky foundation, he argues that Spalding was contractually bound to submit the propriety of any proposed discharge to arbitration. This argument flies in the teeth of both federal labor law and the plain language of the CBA.

"[F]ederal labor law is chiefly designed to promote [] the formation of the collective agreement and the private settlement of disputes under it."  Int'l Union, UAW v. Hoosier

-18-

Cardinal Corp., 383 U.S. 696, 702 (1966).  As a general matter, therefore, arbitration is preferred over litigation in resolving private labor disputes.  See generally United Steelworkers v. Warrior & Gulf Navig. Co., 363 U.S. 574, 581-82 (1960) (discussing benefits of arbitration).  But it is not arbitration per se that federal policy favors;  rather, it is the settlement of disputes by the means mutually agreed upon by the parties themselves — whatever those means may be.  See McCreedy, 809 F.2d at 1237.  By enforcing the results of choices freely made by labor and management, acting in concert, federal law "promote[s] a higher degree of responsibility upon the parties to such agreements, and . . . thereby promote[s] industrial peace."  Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 454 (1957).

In this case, the process to which the parties agreed for settling differences is embodied in Article 9 of the CBA.  That article outlines a two-step procedure for resolving grievances. The first step sets various time limits for processing written grievances.  The second step contemplates that "[i]f the Company's [first-step] answer is unsatisfactory to the Union," then the grievance "shall be submitted to arbitration."  That clause further provides, however, that "[i]f the Union has not submitted a request for arbitration with[in] thirty (30) calendar days of receipt of the step one answer, the grievance shall be considered settled on the basis of [the employer's] answer."

-19-

There is no language in the CBA that guarantees individual employees that every grievance will be arbitrated. To the contrary, the grievance procedure leaves to the Union's sole discretion the decision as to whether to request arbitration. Such provisions are common fare in CBAs — and where they exist, courts typically cede the union considerable leeway in evaluating the merit associated with a particular grievance and the resources that it will expend to prosecute that grievance. Miller v. United States Postal Serv., 985 F.2d 9, 12 (1st Cir. 1993).

Viewed against this backdrop, it is evident that Spalding and the Union reached a final settlement of Mulvihill's grievance when Spalding denied it and the Union elected not to pursue the matter further.[3] As between the parties to the CBA, that determination was "valid, binding, and enforceable." Textile Workers, 353 U.S. at 454. Since Spalding surrendered authority to discharge for proper cause only to the extent specified in the CBA, Mulvihill's argument that he had an absolute right to arbitration will not wash.

Mulvihill next asseverates that deferring to the results of Spalding's investigation violates the summary judgment standard and, in the bargain, denigrates the importance of employee rights

_____

[3]As an aside, the record indicates that the Union at first intended to arbitrate the grievance but chose not to do so after assessing the strength of Spalding's case.

-20-

under collective bargaining agreements. This asseveration lacks force.

As we have explained, Mulvihill bears the burden of demonstrating that Spalding discharged him in derogation of the CBA. Hines, 424 U.S. at 570. Because he has failed to do so, we are bound to honor the final settlement reached by the parties under the terms of the CBA. See E. Associated Coal Corp. v. United Mine Workers, 531 U.S. 57, 62 (2000); Boston Med. Ctr., 260 F.3d at 21. In this context, we are not deferring to Spalding's determination that proper cause existed, but, rather, to the outcome of the grievance procedure described in the CBA. See DelCostello, 462 U.S. at 164 ("Subject to very limited judicial review, [parties to a CBA] will be bound by the result according to the finality provisions of the agreement."). The federal policy of settling labor disputes by privately arranged procedures would be compromised if courts had the final say on the merits of every settlement. See El Dorado Tech. Servs., Inc. v. Union Gen. De Trabajadores, 961 F.2d 317, 319 (1st Cir. 1992).

In a related vein, Mulvihill contends that several factual issues surrounding Spalding's investigation preclude summary judgment. None of his prolix argumentation exposes any material fact sufficient to derail the summary judgment train.

First, Mulvihill posits that a reasonable juror could find that his conduct was that of a concerned employee hoping to

diffuse a potentially explosive situation, not that of a sexual harasser. This thesis runs along the following lines. Mulvihill says that it is reasonable to infer that Spalding acted without proper cause because a more thorough investigation would have revealed the following facts. (1) While Todd Charest was at Mulvihill's home to estimate the costs of a needed roof repair, he inquired whether Mulvihill had heard any rumors that his wife was involved in a sexual liaison with Mike Rattell. (2) Mulvihill replied that he had heard "shop talk" about such a tryst. (3) When Todd Charest asked for Melissa Rattell's telephone number, Mulvihill told him that he did not have it but that he would give Todd's number to Melissa so that she could contact him if she so chose. (4) Mulvihill then gave Melissa Rattell the telephone number and told her of his conversation with Todd Charest. (5) He then recounted these conversations to his supervisor, Montessi, believing that the situation could have detrimental effects for the working environment. (6) According to Mulvihill, Montessi wanted nothing to do with the matter and walked away. (7) Later the same day, Perreault noticed that Amy Charest was not at work and expressed concern about her increased absenteeism and substandard job performance. (8) When Perreault asked Mulvihill if he knew of anything that might be affecting her work, Mulvihill told Perreault of his conversations with Todd Charest and Melissa Rattell.

Even if the record supports this chain of sanguine inferences — a matter on which we take no view — Mulvihill's analysis is misguided. The question here is not whether Amy Charest and Mike Rattell were actually engaged in an extra-marital affair. Nor is the question whether Mulvihill's actions were well-intentioned. The fact is that Spalding, after due investigation, reasonably concluded that Mulvihill's remarks about the alleged affair, regardless of either their accuracy or their purpose, unnecessarily created a hostile work environment for Amy Charest (and, thus, violated Spalding's published sexual harassment policy). This reasonable conclusion constituted proper cause for Spalding to discharge Mulvihill. Seen in this light, Mulvihill's inferential chain, even if credited, would not alter any material fact. See Morris, 27 F.3d at 748 (explaining that a fact, to be material, must have the capacity to affect the outcome of the suit); see also Malik, 202 F.3d at 107.

The next factual dispute to which Mulvihill alludes involves the extent of Spalding's investigation. In this regard, he draws our attention to the statement in Spalding's sexual harassment policy that "no disciplinary action will be taken without a thorough investigation of the facts which shall include gathering of statements from all parties and witnesses involved in the matter." From this launching pad, he jumps to the conclusion that Spalding's investigation was not conducted in good faith (or,

-23-

at least, that a jury could so find) because Bourdeau neglected to interview three potential witnesses. This suggestion cannot withstand scrutiny.

The persons that Bourdeau decided not to interview were Mike Rattell, Melissa Rattell, and Todd Charest. Mulvihill's attack overlooks that Bourdeau reasonably concluded that he did not need to talk to these individuals because the issue was not whether a meretricious relationship existed, but, rather, whether Mulvihill was conversing with his coworkers about Amy Charest's sex life. There is no evidence in the record that suggests that the three named individuals had any personal knowledge as to whether Mulvihill engaged in gossip-mongering. Thus, the decision not to interview them was well within the employer's broad discretion. A fortiori, that decision was insufficient to raise a genuine issue of material fact anent Spalding's good faith.[4] See Williams, 875 F.2d at 1485.

Mulvihill also maintains that there are factual issues regarding the validity of the accusations against him. This is

---

[4]We hasten to add that even were we to assume that the failure to interview one or more of these individuals constituted a violation of Spalding's announced protocol, it would not necessarily undercut the entry of summary judgment. After all, "[t]he grievance processes cannot be expected to be error-free. The finality provision has sufficient force to surmount occasional instances of mistake." Hines, 424 U.S. at 571. Because "[e]fficiency is a fundamental concern of both union and management" in hybrid section 301 actions, minor errors are tolerable. McCreedy, 809 F.2d at 1238.

true as far as it goes — but it does not go very far.  The investigation reveals that all of the witnesses agreed that Mulvihill had commented in the most crude and offensive terms about a sexual liaison between Amy Charest and Mike Rattell.  Although Mulvihill admits his role in the discussions, he denies that he used uncouth language.  That asserted factual dispute has no bearing on our analysis.  There is no evidence that Charest herself was exposed to Mulvihill's comments at first hand and, in all events, the violation that sparked Mulvihill's ouster did not depend on the phraseology that he used.  Whether Mulvihill spoke to his coworkers with the saltiness of a sailor or the eloquence of a Shakespearean scholar, it was the essence of his statements that created the hostile work environment.  The linguistic trappings were, at most, the icing on the cake.  Hence, Mulvihill again fails to limn a material dispute sufficient to block summary judgment.

Finally, Mulvihill asserts that Spalding's sexual harassment policy only prohibited "spreading false rumors."  To bolster this argument, he points to a company manual describing "on the job conduct," which specifically cites the spreading of false rumors as violative of "proper standards of conduct."

This argument is hopeless.  For one thing, the record is devoid of any evidence that Spalding ever limited its sexual harassment policy to conform to this description.  For another thing, the fact that Mulvihill's salacious statements may have been

true — a matter that we need not decide — would not alter the fact that his dissemination of them to Charest's coworkers violated the company's sexual harassment policy and fomented a hostile work environment.

Although Mulvihill's asseverational array contains a smattering of other arguments, none warrants discussion. We conclude, therefore, that Spalding had proper cause for cashiering Mulvihill and that, under the CBA, it bears no liability for wrongful discharge.

### D. **The Fair Representation Claim**.

Our conclusion that Spalding did not breach the CBA when it terminated Mulvihill's employment serves to dispose of his case against the Union as well. To prevail against either defendant in a hybrid section 301 action, a plaintiff must show that the employer discharged him in derogation of the CBA. DelCostello, 462 U.S. at 165. Because we have determined that Mulvihill failed to carry this burden, see supra Part II(C), his suit against the Union necessarily fails.

### E. **The Defamation Claim**.

Mulvihill's complaint also contained a claim that Spalding, by labeling him as a sexual harasser, defamed him. The district court entered summary judgment against him on this claim, and Mulvihill appeals.

This aspect of the case need not occupy us for long. "We have steadfastly deemed waived issues raised on appeal in a perfunctory manner, not accompanied by developed argumentation." United States v. Bongiorno, 106 F.3d 1027, 1034 (1st Cir. 1997). An issue falls into this category when, for example, the proponent mentions it as "a possible argument in the most skeletal way, leaving the court to do counsel's work." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). So it is here.

After citing to his own self-serving testimony to the effect that some of his associates told him that they had heard he was fired for sexual harassment, Mulvihill makes the general assertion that the "record before the court contains an abundance of evidence which a jury could credit showing this charge to be false, and that defendant Spalding knew that Mulvihill did not sexually harass anyone." Appellant's Br. at 45. That is the beginning and the end of his argument vis-à-vis the defamation count. He makes no attempt either to marshal the pertinent facts or to engage in reasoned analysis.

This treatment is too perfunctory to preserve the issue for appeal. Mulvihill has done no more than point in a desultory manner to a welter of paper — the record appendix comprises almost 1,400 pages — without "array[ing] these plethoric evidentiary materials in any systematic way" with respect to his putative cause of action. Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,

142 F.3d 26, 43 (1st Cir. 1998).  That amounts to an invitation that we ransack the record, research the law, and make his argument for him.  We decline the invitation.  See Zannino, 895 F.2d at 17.  Consequently, we deem the argument waived.[5]

## III.  CONCLUSION

We need go no further.  While courts should give broad latitude to employers in investigating charges of sexual harassment in the workplace, the federal interest in eradicating sexual harassment must nonetheless be balanced against the equally strong federal interest in protecting inadequately represented union employees from wrongful discharge.  To achieve this balance, the law allows an employee who is fired for sexual harassment to prevail in an ensuing hybrid section 301 action only if he can show that the employer lacked a substantial evidentiary basis for its determination that he was guilty of sexual harassment.  Mulvihill has failed by a wide margin to make this showing.  He also has failed to make out a prima facie case of defamation.  Accordingly, we affirm the entry of summary judgment in the defendants' favor.

**Affirmed**.

---

[5]In all events, there was no discernible defamation.  Based upon the undisputed facts, Mulvihill, while at work, discussed Charest's sex life with their coworkers.  He thereby contravened Spalding's sexual harassment policy.  See supra Part II(C).  For workplace purposes, that made him guilty of sexual harassment.  Under those circumstances, it is hard to imagine how Spalding's alleged publication could have been actionable.