Connolly, Thomas E., J.
INTRODUCTION
Arides Cabreira, as plaintiff Administrator of the Estate of Alfredo Cabreira, brought this action against the defendant, Verizon New England, Inc. (“Verizon”), pursuant to G.L.c. 229, §§2, 6 to recover for the defendant’s alleged negligence in bringing about the wrongful death of Alfredo Cabreira (“Cabreira”) that occurred in connection with a construction project in Gloucester. The matter is before the Court on Verizon’s motion for summary judgment, in which it claims no liability on account of its lack of control over the construction site. For the following reasons, the motion is DENIED.
BACKGROUND
The summary judgment record read in the light most favorable to the nonmoving party, Arides Cabreira, is as follows: In 1999, Caruso & McGovern Construction, Inc. (“CMC”) and Telesectors Resources Group, Inc., a division of Bell Atlantic, the predecessor in interest to Verizon, entered into a three-year construction agreement (“Agreement"). Under the terms of the Agreement, CMC was to provide construction services as an independent contractor and in accordance with purchase and work orders issued by Verizon. Each work order was to identify the services to be *650 performed; the dates, times, and places for performance; contact information for the Verizon employee to be contacted regarding the work; and special terms and conditions regarding the particular work order. Verizon reserved the right to direct changes in the services at any time for any reason and to cancel all or part of a work order prior to completion of the services.
In addition, all work orders were to be accepted and performed in accordance with the Agreement, including its terms and conditions. CMC was required to comply with all Verizon practices and specifications incorporated into the Agreement. Services performed by CMC were subject to Verizon’s inspection, review, and approval. CMC further warranted that it would perform the services in a professional and workmanlike manner in accordance with the Agreement and industry standards. It was also to be entirely responsible for its actions and was required to comply with all applicable federal, state, and local laws, rules, regulations, and requirements. In particular, CMC agreed to perform the construction services in full compliance with the Federal Occupational Safety and Health Act (“OSHA”) and associated law. Moreover, CMC was to be responsible for providing its own labor, tools, cartage, and equipment and for any injuries or damages resulting from the use thereof.
On August 1, 2002, employees of CMC, Joao Santos (“Santos”) and Cabreira, were providing construction services in Gloucester pursuant to the Agreement and a work order from Verizon (“Work Order”). The plans for the work were drawn by Verizon’s employee, Thomas Hughes (“Hughes”). Santos and Cabreira unloaded a manhole cover from a truck containing a pallet of cement blocks. Santos then attempted to push the pallet further onto the bed of the truck using a backhoe. Santos was not licensed to operate the backhoe. When the pallet caught on the bed of the truck, Cabreira inserted a two-by-four (2 x 4) wood block under the pallet so that it could be pushed. Moments later, the backhoe bucket fatally struck Cabreira. Christopher J. Frates (“Frates”), a police officer working detail duty, then attempted to resuscitate Cabreira. When EMTs arrived shortly thereafter, he was taken by ambulance to Addison Gilbert Hospital. After it was determined that Cabreira had died, an examination by the Office of the Chief Medical Examiner revealed the cause of death to be blunt head and chest trauma.
Also present at the construction site was Dennis A. Howard (“Howard”), Verizon’s contract work inspector. He reported to that site every day to perform his duties and submitted daily reports to Verizon. Howard had authority to order that the work be stopped for any reason, including safety concerns, and was responsible for ensuring that CMC performed the work as specified in the Work Order and in accordance with Verizon’s practices and regulations and federal, state, and local laws. He sometimes assisted the construction crew, arranged for police details, verified the proper execution of forms necessary for CMC’s payment, and obtained street opening permits. In particular, Howard obtained a permit to perform the work from the City of Gloucester for the date of the incident.
DISCUSSION
I. Summary Judgment Standard
A motion for summary judgment shall be granted where the record, including pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, shows that there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a genuine issue as to any material fact and that it is entitled to have questions of law resolved in its favor. Mass.R.Civ.P. 56(c); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991); Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989); Ford Motor Co. v. Barrett 403 Mass. 240, 242 (1988). A fact is “material” if it “is one that might affect the outcome of the suit under the applicable law.” Mulvihill v. The Top-Flite Co., 335 F.3d 15, 19 (1st Cir. 2003). Where the moving party does not bear the burden of proof at trial, it may establish the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opposing party’s case, or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis, 410 Mass. at 716.
If the moving party “establishes the absence of a triable issue,” the nonmoving party cannot defeat the motion by resting on mere allegations or denials in its pleadings or bare assertions of disputed facts. Pederson, 404 Mass. at 17. See LaLonde v. Eissner, 405 Mass. 207, 209 (1989). Rather, the nonmoving party “must respond and allege specific facts which would establish the existence of a genuine issue of material fact” and support its allegations with admissible and competent evidence, such as by submitting into the record affidavits or other evidentiary materials as provided in Rule 56. Pederson, 404 Mass. at 17. See Mass.R.Civ.P. 56(c), (e); LeBlanc v. Great American Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993). For a dispute of material fact to be “genuine,” it must be shown that “a reasonable factfinder could resolve the point in favor of the nonmoving party.” Mulvihill, 335 F.3d at 19. See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (a dispute is “genuine... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party”). In making that determination, the Court must construe the facts in the record in the light most favorable to the nonmoving parly and draw any *651 reasonable inferences in its favor. Ng Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 644 (2002); Harrison v. NetCentric Corp., 433 Mass. 465, 468 (2001). See also United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).
II. Wrongful Death Actions
To recover damages from the defendant for the wrongful death of a person, the executor or administrator of the deceased, as plaintiff, must show that the death was caused by the defendant’s “willful, wanton or reckless conduct . . . under such circumstances that the deceased could have recovered damages for personal injuries if his death had not resulted,” the defendant’s negligence, or his “breach of warranty arising under Article 2 of chapter one hundred and six . . .” G.L.c. 229, §2.[2] To establish Verizon’s liability for negligence under the statute and obtain recovery, the plaintiff must show by a preponderance of the evidence that Verizon breached a legal duly of care it owed to Cabreira and that such negligent conduct proximately caused his death. Davis v. Westwood Group, 420 Mass. 739, 742-43 (1995); Bacon v. Federal Kemper Life Assurance Co., 400 Mass. 850, 853 (1987). Before questions of breach, causation, or injury become important, the existence of a legal duly of care owed by a defendant to the deceased must first be established, as “[t]here can be negligence only where there is a duly to be careful.” Theriault v. Pierce, 307 Mass. 532, 533 (1940). See also Remy v. MacDonald, 440 Mass. 675, 677 (2004) (“If no such duty exists, a claim of negligence cannot be brought”). “The concept of ‘duly’ ... ‘is not sacrosanct in itself, but is only an expression of the sum total of considerations of policy which lead the law to say that the plaintiff is entitled to protection ... No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists.’ ” Jupin v. Kask, 447 Mass. 141, 146 (2006), quoting Luoni v. Berube, 431 Mass. 729, 735 (2000) (citations omitted). Accordingly, whether a defendant owed a duty of care to the deceased under the particular circumstances is a question of law for the Court to resolve where there are no genuine issues of material fact. Cottam v. CVS Pharmacy, 436 Mass. 316, 320 (2002); O’Sullivan v. Shaw, 431 Mass. 201, 203 (2000). The Court may consider existing social policy, values, and customs in its evaluation. Yakubowitz v. Paramount Pictures Corp., 404 Mass. 624, 629 (1989); Mullen v. Pine Manor College, 389 Mass. 47, 51 (1983), quoting Schofield v. Merrill 386 Mass. 244, 247 (1982) (“[A] duty finds its ‘source in existing social values and customs’ ”).
A. Verizon’s Duty of Care
A review of the summary judgment record in the light most favorable to the non-moving party reveals that there are genuine issues of material fact with respect to whether the circumstances surrounding the incident were such that Verizon owed a duty of care to Cabreira under the law. Those factual issues arise by virtue of the relationship between Verizon and CMC, taken in conjunction with the terms of the Agreement and Verizon’s conduct at the site of the injury-producing event.
“As a general principle of tort law, every actor has a duly to exercise reasonable care to avoid physical harm to others.” Remy, 440 Mass. at 677. Such duty is owed to all persons who may be foreseeably affected by his conduct. Jupin, 447 Mass. 147 , quoting Tarasoff v. Regents of the Univ. of Calif., 17 Cal.3d 425, 434-35 (1976) (citations omitted) (“[A] defendant owes a duly of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous”). Here, however, Verizon hired CMC as its independent contractor to perform construction work. The Supreme Judicial Court has articulated the legal standard for determining whether the employer of an independent contractor owed a duty of reasonable care to persons injured in connection with the performance of the work. See generally Corsetti v. Stone Co., 396 Mass. 1 (1985).
Under the well-established rule propounded in Corsetti v. Stone Co., Verizon, as an employer of its independent contractor, CMC, “may be liable for any negligence of [its] own in connection with the work to be done ... So far as [it] in fact [gave] directions for the work, furnishe[d] equipment for it, or retained[ed] control over any part of it, [it was] required to exercise reasonable care for the protection of others.” Corsetti 396 Mass. at 9-10, quoting W. Prosser, Torts §71, at 469 (4th ed. 1971). See also Restatement (Second) of Torts §414 (1965).[3] In particular, where the employer entrusts a part of the work to the independent contractor, “but himself or through a foreman superintends the entire job . . . [he] is subject to liability if he fails to prevent the [independent contractor] from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the [independent contractor’s] work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself.” Corsetti, 396 Mass. at 10-11, quoting Restatement (Second) of Torts, §414 commentb. In essence, “[t]here must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way,” meaning that Verizon must have had some control “as to [CMC’s] methods of work, or as to operative detail.” Foley v. Rust Int’l, 901 F.2d 183, 184 (1st Cir. 1990), quoting Restatement (Second) of Torts, §414 comment c. Any such “meaningful control, however minimal,” over CMC’s performance would serve as a basis for a duty of care running from Verizon to employees of CMC. Dilaveris v. W.T. Rich Co., Inc., 424 Mass. 9, 11 (1996); Chiao-Yun Ku v. Town of Framingham, 62 Mass.App.Ct. 271, 275 (2004), quoting *652 Paradoa v. CNA Ins. Co., 41 Mass.App.Ct. 651, 654 (1996) (“[C]ontrol over the task need not descend to the last detail or operation for the imposition of liability to result”). However, whether Verizon had “sufficient control over part of the work” being performed by CMC to render it liable “is a question of fact for the jury.” Corsetti, 396 Mass. at 11.
1. Construction Site
The record contains evidence of Verizon’s actual exercise of control over the work on the date of the incident. Verizon retained Howard as a full-time contract inspector at the Gloucester construction site. The specifics of Howard’s role and actions as Verizon’s inspector are material to the factual inquiry of whether Verizon was in control of the details of the work being performed and the manner in which Santos and Cabreira were to effect its performance, as well as safety conditions at the site. See Dilaveris, 424 Mass. at 12-13 (opportunity and failure of employer’s construction supervisor to stop or prevent independent contractor from continuing work in unsafe manner “makes the issue of [the employer’s] control and negligence questions for the jury”). The deposition testimony of Howard, Frates, Santos, and Gerard J. McGovern, CMC’s president (“McGovern”), describes that as an onsite inspector for Verizon, Howard’s primary objective was to ensure that work would be performed according to Verizon’s specifications and regulations, as well as in compliance with federal, state, and local laws. The depositions indicate that he had authority to dictate what work Verizon wanted done and how that work was to be performed. Howard could order the work to be stopped for any reason, including safely concerns. According to Howard, violations of safely regulations would contradict the way Verizon wanted the job to be done.[4]
Howard also stated that the plans for the work that was to be done at the Gloucester construction site were drawn by Hughes, a Verizon employee. He spoke of Verizon as having generated work orders that were communicated to CMC and corroborated that Verizon could change the terms and conditions of work orders and inspect CMC’s performance. Moreover, he reported to the construction site where the incident took place almost every day and would file daily reports with Verizon. On occasion he would assist the construction crew, obtain street opening permits, line up police details, and make certain that forms were executed so that CMC could be paid for the work it provided.
Howard also procured the permit to perform the work at the construction site from the City of Gloucester. The copy of the permit submitted to the Court is instructive, as it contained Howard’s signature as Verizon’s representative and as the applicant of the permit. He provided his company address and telephone number. The permit required that the licensee “conform to the statutes and ordinances of the City . . . and to the specifications in [the] permit...” It also identified Verizon as the entity to which “[p]ermission [was] granted ... to open/occupy/obstruct part of Washington St. and Hodgkin St.” (i.e. the location of the incident) for the purpose of installing a new conduit.
2. The Agreement
The Agreement between CMC and Verizon “cannot vary or heighten any duty [Verizon] may have owed to [CMC or Cabreira],” but nonetheless may be considered evidence of Verizon’s authority and position to control the construction site and work in Gloucester for purposes of establishing a duty of care.[5] Corsetti, 396 Mass. at 11 n.8; Kushner v. Dravo Corp., 339 Mass. 273, 276-77 (1959). The Agreement suggests that some degree of independence was given to CMC in executing the construction services, but qualifies such freedom with provisions recognizing Verizon’s involvement and influence over the project and work orders. CMC had agreed to be responsible for its actions. It would provide its own labor, tools, materials, cartage, and equipment and was to be responsible for any injuries or damages associated therewith. Nevertheless, work orders were to be issued by Verizon and detail the services requested of CMC, including dates, times, locations, contact information of Verizon personnel, and special conditions. Verizon required that CMC accept and perform all work orders in accordance with the Agreement, as well as its terms and conditions, and that CMC comply with all of Verizon’s practices and specifications as incorporated into the Agreement. All work was subject to Verizon’s approval. Verizon remained authorized to inspect and review the work being performed, had the right to make changes in the services for any reason, and could cancel all or part of a work order before its completion.
A contractual allocation of responsibility to ensure jobsite safety is also important in determining whether the employer of an independent contractor may be liable in negligence to employees of the latter. See Foley, 901 F.2d at 185. In Foley, a contract between a general contractor and subcontractor provided that the “[s]ubcontractor alone [was] obligated to provide for the safety of his employees at the jobsite” and that nothing in the contract was to be construed as removing responsibility for safety from the subcontractor. Foley, 901 F.2d at 185 (emphasis added). Applying the Corsetti test, the Court read those provisions in connection with other surrounding facts and concluded that the general contractor did not retain a sufficient level of control over its subcontractor’s performance of the work and so was not liable to one of the subcontractor’s employees. See Foley, 901 F.2d at 185.
However, the Agreement in this case is unlike that discussed in Foley. Although CMC agreed to perform the services in a professional and workmanlike man *653 ner in accordance with the Agreement and industry standards, as well as in compliance with all applicable federal, state, and local laws, rules, regulations, and requirements, including OSHA, the Agreement does not contain terms that definitively made jobsite safely the exclusive responsibility of CMC. The language merely requires that CMC’s conduct conform with the requirements of law and is passive with respect to Verizon’s responsibility and intention to do the same. Accordingly, there is a basis in the Agreement to support a conclusion that it remained the joint responsibility of both Verizon and CMC to ensure safety at the Gloucester construction site and that Verizon, through Howard, had the opportunity to act consistent with that responsibility in supervising and directing the construction project. CMC’s acquiescence to comply with safety laws need not operate to the exclusion of any similar responsibility of compliance owed by Verizon or suggest that Verizon had surrendered management and control over the work or jobsite safety.[6] In sum, the evidence before the Court indicates that a reasonable jury could find that Verizon had the ability to direct the manner and operative details of the performance of the work such that CMC was not entirely free to do the work in its own way. A jury may conclude that the Agreement did not leave CMC to its own devices, but instead recognized that Verizon would maintain a meaningful, even if minimal, level of authority to control the execution of the work orders and safely measures at the Gloucester construction site. It may conclude that Howard had the opportunity not only to control CMC’s compliance with Verizon’s project specifications and conditions, but also to superintend and control safety conditions on the site, identify safety hazards, ensure CMC’s compliance with its safety obligations, and to have otherwise taken steps which could have prevented Cabreira’s death.
Therefore, the record raises genuine issues of material fact with respect to the degree of control that Verizon maintained over safety and the work being performed at the Gloucester construction site at the time the incident occurred as to have owed a duty of care to Cabreira necessary to establish its liability under Corsetti. The defendant’s motion for summary judgment must be denied.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendant’s motion for summary judgment be DENIED.

General Laws chapter 229, §2 provides, in part:
A person who (1) by his negligence causes the death of a person, or (2) by willful, wanton or reckless act causes the death of a person under such circumstances that the deceased could have recovered damages for personal injuries if his death had not resulted, or (3) operates a common carrier of passengers and by his negligence causes the death of a passenger, or (4) operates a common carrier of passengers and by his willful, wanton or reckless act causes the death of a passenger under such circumstances that the deceased could have recovered damages for personal injuries if his death had not resulted, or (5) is responsible for a breach of warranty arising under Article 2 of chapter one hundred and six which results in injury to a person that causes death, shall be liable in damages ... A person shall be liable for the negligence or the willful, wanton or reckless act of his agents or servants while engaged in his business to the same extent and subject to the same limits as he would be liable under this section for his own act. Damages under this section shall be recovered in an action of tort by the executor or administrator of the deceased. An action to recover damages under this section shall be commenced within three years from the date of death, or within three years from the date when the deceased’s executor or administrator knew, or in the exercise of reasonable diligence, should have known of the factual basis for a cause of action, or within such time thereafter as is provided by section four, four B, nine or ten of chapter two hundred and sixty.
Damages for the deceased’s conscious suffering may be recovered. G.L.c. 229, §6.

The Restatement (Second) of Torts §414 forms the basis of the Corsetti holding, stating: “One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.”

The record contains evidence that the U.S. Department of Labor issued three Citation and Notifications of Penalty to CMC in connection with the incident, dated October 10, 2002. The citations allege violations of OSHA and 29 C.F.R. 1926, including the exposure of employees to the risk of being struck or crushed by the backhoe arm or bucket, the failure to instruct employees in recognizing and avoiding unsafe conditions in working with and operating hydraulic backhoe loaders, and the failure of employees to use protective helmets while working with hydraulic backhoe loaders.

The most pertinent portions of the Agreement are as follows:
Section 3.1: “The [Work Order] shall reference this Agreement and contain the following information: the Service to be performed: the time and place for performance; the date of the [Work Order]; the billing address; the name and telephone number of the employee of [Verizon] for you to contact regarding the Services; and any special terms and conditions relevant to the particular [Work Order].”
Section 3.2: “All oral or written Work Orders shall be deemed to incorporate the terms and conditions of this Agreement. You agree to accept all Work Orders issued in conformance with this Agreement.”
Section 3.3: “[Verizon] may . .. cancel all or part of a Work Order at any time prior to your completing the Services.”
Section 4.1: “[VerizonI may direct changes in the Services or the schedule at any time for any reason.”
Section 6.1: “You shall perform the Services in compliance with all government and industry standards and specifications, as well as any standards and specifications that you have published. In addition, the Services shall comply with all [Verizon] practices . . . and . . . the following specifications that are attached hereto and incorporated into this Agreement and made a part hereof: Exhibit A, Unit Prices; Exhibit Al, Local Practices; Exhibit B, Time & Material; Exhibit C, Location of Work.”
Section 8.1: “Unless otherwise indicated on a . . . [Work Order], you shall perform the Services at the location[s[ specified (if applicable) in the [Work Order] on the date[s] *654 requested. [Verizon] shall not be obligated to accept any untimely, excessive or incomplete performance.”
Section 8.2: “If you are to perform the Services on [Verizon’s] premises or on the premises of a third party, then your schedule for performing the Services, particularly with respect to removing or installing material and/or fixtures and the moving of material, shall be subject to [Verizon’s] review and approval.”
Section 10.3: “[Verizon] shall designate a point of contact to whom Service Provider shall provide reports on a daily basis ... or as otherwise directed by [Verizon].”
Section 16.1: “All Services are subject to inspection and acceptance by [Verizon] or its agent during and after the completion of the Services. If the Services do not conform or comply with the requirements of this Agreement or an applicable Purchase Order or Work Order, then [Verizon], in addition to any other rights it may have under the law or this Agreement, may reject some or all of the Services.”
Section 18.1: “You shall perform the Services as an independent contractor, and not as an employee, joint venture partner or agent of [Verizon] or any of its parent, subsidiary or affiliated companies. You may not bind [Verizon] or any of its parent or affiliate companies to any third parties. You shall be entirely responsible for your actions. Any and all sub-contractors must be approved by the [Verizon] contract work administrator in advance of work being performed.” (Emphasis omitted.)
Section 18.2: “You are responsible for supervising your employees and contractors and for ensuring that all of your employees and subcontractors comply with the terms and conditions of this Agreement.”
Section 19.1: “You shall provide all labor, tools, materials, cartage and equipment (“tools”) for performing the Services, and perform all work required for the full performance of eveiything shown, described or reasonably implied by the Purchase Order and/or Work Order and Specifications . . . You shall be responsible for any damages or injuries resulting from your use of the tools in accordance with the clause titled ‘Indemnification.’ ”
Section 20.2: “All Services performed by you under this Agreement will fully comply with the provisions of the Federal Occupational Safety and Health Act and with all rules issued thereunder."
Section 21.1: “You warrant that you will perform the Services in a professional and workmanlike manner in full accordance with this Agreement, applicable laws and the highest standards of the industry.”
Section 21.2: “[Verizon] may, without limiting any of its other rights under this Agreement or at Law, require you to reperform Services and replace products which do not meet an applicable warranty.”
Section 31.1: “You agree to comply with all applicable Federal, State and local laws, rules, regulations, requirements and orders that are directly or indirectly related to your performance under this Agreement.”
Section 31.3: “[Verizon] will obtain required inspection and approval certificates, pay all fees for the same and provide you with one duly signed and approved copy of each such certificate.”

For example, section 10.03 of 454 Code Mass. Regs. requires that “(a) [a]ll places where employees are directed or permitted to perform work of any kind in construction work or demolition work shall be so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection of the lives, health and safety of employees and others, (b) Employers, owners, contractors, sub-contractors, superintendents or foremen in charge, and other persons obligated by law to adhere to the requirements of 454 CMR 10.00 shall not direct, or permit an employee to work under conditions which are not in compliance with or which are prohibited by 454 CMR 10.00.” 454 Code Mass. Regs. §10.03(1). Furthermore, “[e]veiy employer shall inaugurate and maintain an accident prevention program for the duration of the job. Employers shall emphasize the cooperation that is needed, review accident experience, check responsibility for accident control, guide and advise job personnel.” 454 Code Mass. Regs. §10.03(1)(c).