[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-13124

_____

D.C. Docket No. 1:12-cv-02018-MHC


MICHAEL LESLIE LAKE,

Plaintiff-Appellee,

versus

MICHAEL SKELTON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(November 3, 2016)

Before WILLIAM PRYOR, BLACK, and PARKER,[*] Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

---

[*] Honorable Barrington D. Parker, Jr., United States Circuit Judge for the Second Circuit, sitting by designation.

This interlocutory appeal requires us to decide whether sovereign immunity bars a complaint for damages against a deputy sheriff who failed to accommodate a dietary request from an inmate in a county jail in Georgia. Michael Leslie Lake requested a vegetarian diet for religious reasons during his pretrial detention. After his jailers denied the request, Lake sued Major Michael Skelton in his official capacity as a deputy sheriff of Cobb County. Lake sought declaratory relief, damages, fees, and costs for violations of the First and Fourteenth Amendments and the Religious Land Use and Institutionalized Persons Act. 42 U.S.C. §§ 1983, 2000cc *et seq*. The district court denied Major Skelton's motion for summary judgment against Lake's claims for damages, and Skelton filed an interlocutory appeal. We conclude that the sovereign immunity of Georgia extends to a deputy sheriff who denies a dietary request of an inmate in a county jail. We reverse the denial of summary judgment against Lake's claims for damages and remand with an instruction to enter judgment for Skelton on those claims.

## I. BACKGROUND

Lake, a Christian, alleges that he made a religious vow in 1997 to abstain from eating meat, animal fats, or gelatin. He also refuses to eat any part of a meal that contains those items or to trade those items for acceptable food. Lake took the vow because he thought it would gain him the friendship of a woman named Leslie.

2

On November 28, 2011, Lake was arrested for contacting Leslie, allegedly in violation of a stalking protective order. He was held without bond at the Cobb County Adult Detention Center, which is operated by the sheriff of Cobb County. Major Skelton served as operational support commander at the Detention Center.

Lake requested a special diet to accommodate his religious vow, but the jailers denied that request. In May 2012, Lake sued Major Skelton. The jailers accommodated Lake's request on November 29, 2012. Lake was released on July 15, 2013, after the Cobb County Superior Court dismissed all charges against him.

Lake sued Major Skelton in his official and individual capacities. He alleged that Skelton violated the First and Fourteenth Amendments and the Religious Land Use and Institutionalized Persons Act. Lake sought declaratory relief, damages, fees, and costs.

Major Skelton moved for summary judgment. The district court granted summary judgment for Skelton in his individual capacity, but it denied summary judgment for him in his official capacity on the ground that the sovereign immunity of Georgia did not extend to him. Skelton filed an interlocutory appeal, and we have jurisdiction limited to the issue of his immunity, *see Black v. Wigington*, 811 F.3d 1259, 1270 (11th Cir. 2016).

3

## II. STANDARD OF REVIEW

We review *de novo* a summary judgment, including the issue whether the sovereign immunity of a state extends to an official. *Purcell ex rel. Estate of Morgan v. Toombs County*, 400 F.3d 1313, 1324 n.26 (11th Cir. 2005). We draw all reasonable inferences in favor of the nonmoving party, *Black*, 811 F.3d at 1265, and summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

## III. DISCUSSION

A state is immune from a suit for damages in federal court by one of its own citizens, *Hans v. Louisiana*, 134 U.S. 1, 14–17 (1890), and this sovereign immunity extends to an official when he acts as an "arm of the State," *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). Before our en banc decision in *Manders*, we applied different tests to determine whether the sovereign immunity of a state extended to an officer. One test had four factors, *see Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*, 226 F.3d 1226, 1231 (11th Cir. 2000), and another had three factors, *see Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.*, 208 F.3d 1308, 1311 (11th Cir. 2000). A third test specifically addressed deputy sheriffs and jailers. *See Lancaster v. Monroe County*,

4

116 F.3d 1419, 1429 (11th Cir. 1997). In *Manders*, we established a single test to determine when an official or entity acts as an arm of the state. We first determine "the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." *Manders*, 338 F.3d at 1308. We then determine whether the defendant is an "arm of the State" in his performance of the function by considering four factors: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Id.* at 1309. In applying these four factors, we evaluate both the "governmental structure of [the] office vis-à-vis the State" and the "functions in issue." *Id.*

*Manders* applied the four-factor test to decide whether the sheriff of Clinch County, Georgia, was acting as an arm of the state in "establishing force policy at the jail and in training and disciplining his deputies in that regard." *Id.* at 1319. The first factor "weigh[ed] heavily in favor of immunity" because "[t]he sheriff's authority to use force or the tools of violence . . . and the sheriff's obligation to administer the jail are directly derived from the State" and because "use of force and creating force policy are quintessential policing functions." *Id.* The second factor also "weigh[ed] heavily in favor of immunity," *id.* at 1322, because, "[i]n addition to mandating and controlling sheriffs' specific duties . . . , only the State possesses control over sheriffs' force policy and that control is direct and

5

significant in many areas, including training and discipline," *id.* at 1320. The third

factor "tilt[ed] . . . toward immunity," *id.* at 1324, because the state partially

funded the sheriff's office and the financial contributions of the county were

required by state law, *id.* at 1323–24. The fourth factor "d[id] not defeat

immunity," *id.* at 1329, because although neither the state nor the county was

required to pay an adverse judgment, the sheriff apparently would have to pay out

of his budget and "both county and state funds are implicated," *id.* at 1327. The

Court also stated that "the State's sovereignty and thus its integrity remain directly

affected when federal court lawsuits interfere with a state program or function." *Id.*

at 1329. We concluded that the sheriff of Clinch County, Georgia, was immune

from a suit for damages that challenged his policy on the use of force. *Id.* at 1328.

### A.  *Governmental Structure*

We must apply the four-part test from *Manders* to the function performed by

Major Skelton as a deputy sheriff. Whether a deputy sheriff in Georgia is an arm of

the state is complicated. On the one hand, the offices of sheriff and deputy are

created by state law, *see* Ga. Const. Art. IX, § I, ¶ III (sheriff); Ga. Code Ann.

§ 15-16-23 (deputy), sheriffs sometimes function as an arm of the state, *see, e.g.*,

*Manders*, 338 F.3d at 1305–06, and the office is independent from Cobb County

and its governing body, *see* Ga. Const. Art. IX, § II, ¶ I(c)(1). On the other hand,

the Constitution of Georgia refers to sheriffs as "County officers," *see id.* Art. IX,

6

§ I, ¶ III, sheriffs are elected by the voters of their counties, *see Manders*, 338 F.3d at 1312, and sheriffs largely exercise their authority within their counties, *see id.*

Georgia exerts significant control over the Cobb County Sheriff. The office of the sheriff, although independent, is not a "body corporate" like Georgia counties are. *See* Ga. Const. Art. IX, § I, ¶ I; Ga. Code Ann. §§ 36-1-3 and 1-3-3(7). Instead, the State legislature establishes the powers and duties of sheriffs. *See* Ga. Const. Art. IX, § I, ¶ III. These duties fall into two broad categories: (1) the common-law duty of "enforc[ing] the law and preserv[ing] the peace on behalf of the sovereign State"; and (2) "specific statutory duties, directly assigned by the State, in law enforcement, in state courts, and in corrections." *Manders*, 338 F.3d at 1319. "Most of those duties are an integral part of the State's criminal justice system and are state functions." *Id.*

Georgia uses county jails to incarcerate its state offenders, and it requires sheriffs to take custody of all inmates in the jail in their counties and to administer the jails. *Manders*, 338 F.3d at 1315–18. Sheriffs are responsible for transferring detainees to and from state court, *id.* at 1315–16, and sheriffs have discretion to transfer inmates between counties, *id.* at 1317. "In contrast, counties have no authority over what corrections duties sheriffs perform, or which state offenders serve time in county jails, or who is in charge of the inmates in the county jails." *Id.* at 1318.

The Georgia Constitution prohibits counties from taking actions "affecting" the office of the sheriff, including "the salaries . . . [and] the personnel thereof." Ga. Const. Art. IX, § II, ¶ I(c)(1). Counties do not delegate their governmental or police powers to their sheriffs. *See Manders*, 338 F.3d at 1319. "Although the State requires the county to fund the sheriff's budget, Georgia's Constitution precludes the county from exercising any authority over the sheriff, including how the sheriff spends that budget." *Id.* at 1311; *see also Chaffin v. Calhoun*, 415 S.E.2d 906, 907 (Ga. 1992) ("[A]lthough the county commission has the power and the duty to issue a budget, the county commission may not dictate to the sheriff how that budget will be spent in the exercise of his duties.").

The independence of sheriffs from the county is underscored by the treatment of sheriffs' employees. The office of the sheriff has sole authority to appoint and discharge its employees, including deputies. *Manders*, 338 F.3d at 1311. Both the sheriff and the state can discipline deputy sheriffs for misconduct, *see Pellitteri v. Prine*, 776 F.3d 777, 781 (11th Cir. 2015), but the county has no such authority, *see Grech v. Clayton County*, 335 F.3d 1326, 1347 (11th Cir. 2003) (en banc). Georgia caselaw recognizes that deputies are employees of the sheriff and not the county. *See id.* at 1336.

The Cobb County Sheriff derives his powers from the State and, with the exception of funding, is largely independent of the county. Although this

8

framework informs our analysis by providing evidence of "the governmental structure of [the sheriff's] office vis-à-vis the State," *id.* at 1309, all we need to decide today is whether Major Skelton acted as an arm of the State in the function of providing food to inmates.

### B. *The Factors from* Manders

The factors from *Manders* weigh in favor of immunity for Major Skelton. The first three factors—definition in state law, control under state law, and the source of funds—favor immunity. And the fourth factor—responsibility for judgments—"does not defeat immunity." *Id.* at 1329.

### 1. How State Law Defines the Function

We explained in *Manders* that "the essential governmental nature of [a sheriff's] office" includes "perform[ing] specific statutory duties, directly assigned by the State, in law enforcement, in state courts, and in corrections." *Id.* at 1319. One of those duties is taking custody of inmates in the county jail. *See id.* at 1315; Ga. Code Ann. § 42-4-4(a)(1) ("It shall be the duty of the sheriff . . . [t]o take from the outgoing sheriff custody of the jail and the bodies of such persons as are confined therein . . . ."). The duty to take custody of inmates entails certain custodial responsibilities over the bodies of inmates. For instance, it is "the duty of the sheriff" to furnish "medical aid, heat, and blankets, to be reimbursed if necessary from the county treasury." *Id.* § 42-4-4(a)(2). Georgia courts have

9

interpreted this provision as giving sheriffs exclusive control vis-à-vis the county over choosing vendors for medical care. *See Bd. of Comm'rs of Spalding Cty. v. Stewart*, 668 S.E.2d 644, 645 (Ga. 2008) ("[T]he sheriff necessarily is vested with authority to enter into contracts with medical care providers. The [county] board cannot control the sheriff's choice [of provider]." (citation omitted)).

Another such responsibility is the function of providing food to inmates, which title 42 of the Georgia Code imposes directly on the sheriff. *See* Ga. Code Ann. §§ 42-4-32, 42-5-2. We first discuss sections 42-4-32 and 42-5-2 individually. We then consider sections 42-4-32 and 42-5-2 in the broader context of Georgia law. Finally, we address the office of deputy sheriff, concluding that a deputy sheriff wears a "state hat," *Manders*, 338 F.3d at 1319, when determining whether to provide an inmate with his requested diet.

### a.  Section 42-4-32

Chapter 4 of title 42 governs "municipal [and] county jail[s] used for the detention of persons charged with or convicted of either a felony, a misdemeanor, or a municipal offense." Ga. Code Ann. § 42-4-30(1). Section 32 of that chapter governs the provision of food. It provides that all inmates in the county jail shall receive "not less than two substantial and wholesome meals daily." *Id.* § 42-4-32(b). It also requires that "[a]ll aspects of food preparation and food service shall

10

conform to the applicable standards of the Department of Public Health." *Id.* § 42-4-32(a).

Section 42-4-32 imposes duties on the "officer[s] in charge" of municipal and county jails, *id.* § 42-4-32(d), which the statute defines primarily as "the sheriff" of a county jail, *id.* § 42-4-30(3). That section 42-4-32 imposes duties directly on the sheriff, a constitutional officer of the state of Georgia, *see* Ga. Const. Art. IX, § I, ¶ I, and not on the county in which the jail is located, is evidence that the provision of food is a state function under Georgia law.

### b. Section 42-5-2

Chapter 5 of title 42 also supports our conclusion that the provision of food is a state function. Although chapter 5 regulates "correctional institutions of state and counties," Ga. Code Ann. tit. 42, ch. 5, its provisions are devoted in part to allocating responsibilities between correctional institutions and jails, *see, e.g.*, *id.* §§ 42-5-51; 42-5-2; *see also City of Atlanta v. Mitcham*, 769 S.E.2d 320, 325 (Ga. 2015) (discussing the provision of medical treatment by a municipal corporation under section 42-5-2(a)); *Graham v. Cobb County*, 730 S.E.2d 439, 443–44 (Ga. Ct. App. 2012) (distinguishing the obligation of a county to pay for medical care under section 42-5-2 and the duty of the sheriff and his deputies to provide it). Section 42-5-2 makes it "the responsibility of the governmental unit, subdivision, or agency having the physical custody of an inmate to maintain the inmate,

11

furnishing him food, clothing, and any needed medical and hospital attention." Ga. Code Ann. § 42-5-2. Lake argues that because counties are the governmental unit with custody under section 42-5-2, the provision of food is a county function. But Georgia law clearly requires the sheriff to "take . . . custody of the jail and the bodies of such persons as are confined therein." *Id.* § 42-4-4(a)(1). The sheriff, not the county, is the "governmental unit, subdivision, or agency" having custody of inmates in county jails. Section 42-5-2 supports our conclusion that Georgia imposes food-service responsibilities directly on the sheriff as part of his custodial duties.

### c.  Sections 42-4-32 and 42-5-2 in Context

To the extent that doubt remains about the source of the sheriff's responsibility under sections 42-4-32 and 42-5-2, we look to the broader context and structure of Georgia law. *See Manders*, 338 F.3d at 1310–12, 1319. As a general matter, the sheriff holds a constitutional office independent of Cobb County and its governing body, *see* Ga. Const. Art. IX, § II, ¶ I(c)(1), and subject to control by the Georgia legislature, *see id.* Art. IX, § I, ¶ III(a)-(b). Counties do not delegate power to sheriffs, *see Manders*, 338 F.3d at 1319, and "Georgia's Constitution precludes the county from exercising any authority over . . . how the sheriff spends [his] budget," *id.* at 1311; *see also* Ga. Const. Art. IX, § II, ¶ I(c)(1); *Chaffin*, 415 S.E.2d at 907.

12

Caselaw interpreting section 42-5-2 in the context of medical care suggests that the statute operates differently depending on whether the jail in question was a municipal or county jail. Section 42-5-2 imposes a unified duty on municipalities to pay for and ensure that inmates are provided with medical care. *See Mitcham*, 769 S.E.2d at 325 & n.5 (explaining that municipalities are responsible under section 42-5-2 for the failure of municipal police to provide "needed medical and hospital attention" to inmates in pretrial detention (quoting Ga. Code Ann. § 42-5-2(a))). And municipal jails are run by the chief of police, who is appointed and supervised by the municipality. *See* Ga. Code Ann. § 42-4-1(b) ("[C]hiefs of police are the jailers of the municipal corporations and have the authority to appoint other jailers, subject to the supervision of the municipal governing authority, as prescribed by law."). But counties lack supervisory authority and "delegate no powers or duties to sheriffs." *Manders*, 338 F.3d at 1319. With respect to county jails, section 42-5-2 imposes two separate duties: the county must fund the provision of medical care, and the sheriff must select an appropriate provider and ensure that inmates receive care when necessary. *See Stewart*, 668 S.E.2d at 645 (holding that sheriffs enjoy exclusive control over the provision of medical care).

Our dissenting colleague argues that the Georgia Court of Appeals has long construed section 42-5-2 to impose a duty on counties, not sheriffs, to provide medical care. Diss. Op. at 22, 24–29. He reads sections 42-5-2 and 42-4-32

13

"harmoniously" to mean that "the sheriff acts on behalf of the county" when providing food to inmates. *Id.* at 27. We respectfully disagree.

The Georgia Court of Appeals has never construed section 42-5-2 to mean that a sheriff acts on behalf of the county when he provides medical care. Instead, the Georgia Court of Appeals, like we do, distinguishes between the duty imposed by section 42-5-2 on a county to fund medical care and the duty of a sheriff to provide medical care. *See Tattnall Cty. v. Armstrong*, 775 S.E.2d 573, 577 (Ga. Ct. App.  2015) (en banc) (explaining that section 42-4-4(a)(2) "places certain duties on a sheriff to provide an inmate with medical care,"  whereas section "42-5-2(a) imposes upon the county the duty and cost of medical care for inmates" (quoting *Graham*, 730 S.E.2d at 443)), *overruled on other grounds by Rivera v. Washington*, 784 S.E.2d 775 (Ga. 2016). And none of the other decisions cited by our dissenting colleague hold that section 42-5-2 imposes a non-fiscal duty on counties in particular. *See Epps v. Gwinnett Cty.*, 499 S.E.2d 657, 663 (Ga. Ct. App. 1998) (failing to distinguish between the duty imposed on counties by section 42-5-2 and the duty imposed on sheriffs); *Cherokee Cty. v. N. Cobb Surgical Assocs., P.C.*, 471 S.E.2d 561, 564 (Ga. Ct. App. 1996) (citing *Macon-Bibb Cty. Hosp. Auth. v. Houston Cty.*, 428 S.E.2d 374, 376 (Ga. Ct. App.1993)) (explaining that 42-5-2 imposes cost of inmate medical care on the county).

14

Section 42-5-2 regulates both the furnishing of "food" and the furnishing of "needed medical and hospital attention," Ga. Code Ann. § 42-5-2, and we draw the same distinction regarding food that the Georgia Supreme Court and the Georgia Court of Appeals have drawn regarding medical care. Although the Georgia Code may not be a model of clarity when it comes to allocating responsibility in the context of corrections, we conclude that the duty to feed inmates—including the denial of an inmate's dietary request—is not delegated by the county but instead is "directly assigned by the state." *Manders*, 338 F.3d at 1319; *see also Boswell v. Bramlett*, 549 S.E.2d 100, 102 (Ga. 2001) ("[T]he '[p]owers of county commissioners are strictly limited by law, and . . . '[i]f there is reasonable doubt of the existence of a particular power, the doubt is to be resolved in the negative.'" (second and fourth alterations in original) (quoting *Mobley v. Polk County*, 251 S.E.2d 538, 541 (Ga. 1979))).

### d.  Deputy Sheriffs

A deputy's functions are derived from the sheriff's functions, so the deputy's performance of this function is also a state function. Georgia law allows sheriffs "in their discretion to appoint one or more deputies." Ga. Code Ann. § 15-16-23. Deputies are employees of the sheriff, and only the sheriff can hire deputies. *Pellitteri*, 776 F.3d at 780. Although the sheriff may place his deputies under a county civil-service system, it is his choice whether to do so. *See Grech*, 335 F.3d

15

at 1338. And the sheriff trains and supervises deputies. *See id.* at 1336. Because the sheriff wears a "state hat," *Manders*, 338 F.3d at 1312, when he denies an inmate's dietary request, and because a deputy receives all of his powers and obligations with respect to feeding inmates from the sheriff, we conclude that a deputy also wears a "state hat" when he denies an inmate's dietary request.

### 2.  Where State Law Vests Control

Georgia law vests control over the denial of Lake's dietary request in the state through the law on feeding inmates in county jails and the law on training and disciplining deputies. State law regulates food preparation and food service in the jail. It guarantees inmates "not less than two substantial and wholesome meals daily," Ga. Code Ann. § 42-4-32(b), and provides that "[a]ll aspects of food preparation and food service shall conform to the applicable standards of the Department of Public Health," *id.* § 42-4-32(a). As we explained in *Manders*, this regulation of "the preparation, service, and number of meals" is "evidence of how the duties of sheriffs in Georgia are governed by the State and not by county governing bodies." 338 F.3d at 1317 n.30. This statute establishes state control over the feeding of Lake and, by extension, over Major Skelton's denial of Lake's dietary request.

Lake dismisses section 42-4-32 as a law of general application that cannot establish control, but we disagree. Although Lake is correct that *Manders*

16

distinguished "laws of general application" that do not establish control from "specific statutes" that do, *id.* at 1321, Lake is wrong that section 42-4-32 is a law of general application. Section 42-4-32 applies only to jails. The section uses the term "officer in charge," Ga. Code Ann. § 42-4-32(d), which the statute defines as "the sheriff, if the detention facility is under his supervision, or the warden, captain, or superintendent having the supervision of any other detention facility," *id.* § 42-4-30(3). Because section 42-4-32 contemplates county jails run by sheriffs or his appointees, it is not a law of general application.

That section 42-4-32 governs both municipal and county jails does not affect this conclusion. As we discussed in connection with the first factor from *Manders*, Georgia law makes municipalities responsible for complying with section 42-4-32 in municipal jails. *See* Ga. Code Ann. 42-4-30 (referring to municipal jails). But the responsibility of sheriffs to comply with section 42-4-32 is direct and subject only to state control. *Cf. Manders*, 338 F.3d at 1319; *Stewart*, 668 S.E.2d at 645.

Lake also argues that the county controls the function of feeding inmates because it pays for the food, but this funding does not establish control. As we have explained, "The Georgia Supreme Court has held that counties 'must provide reasonably sufficient funds to allow the sheriff to discharge his legal duties,' and that 'the county commission may not dictate to the sheriff how that budget will be spent in the exercise of his duties.'" *Manders*, 338 F.3d at 1323 (quoting *Chaffin*,

17

415 S.E.2d at 907–08). The state, not the county, has legal control over the preparation and service of food in county jails.

Lake next argues that the food-service contracts signed by the county, the sheriff, and the food vendors appear to give the county some control, but these contracts do not affect our analysis of where state *law* vests control. We acknowledge that *Manders* referred vaguely to the "degree of control the State maintains over the entity," *id.* at 1309, and to counties not having control, *see id.* at 1321, 1322, 1328. But the en banc Court specifically defined the factor as "examin[ing] where Georgia *law* vests control," *id.* at 1320 (emphasis added), and we applied it consistent with that definition, *see id.* at 1320–22. For the reasons already discussed, Georgia law vests control over feeding inmates in the state.

The training and discipline of deputies provides further evidence of control by the state. The Peace Officer Standards and Training Council, a state entity, can discipline deputy sheriffs for misconduct by reprimanding them or by limiting, suspending, or revoking their certification as peace officers. *Pellitteri*, 776 F.3d at 781. Moreover, the state trains and disciplines sheriffs, *Manders*, 338 F.3d at 1320–21, and sheriffs train and discipline deputies, *Grech*, 335 F.3d at 1336. This disciplinary power includes the obligation to ensure that sheriffs do not "[v]iolat[e] or attempt[] to violate a law . . . of [Georgia] . . . [or] the United States," Ga. Code Ann. § 35-8-7.1(a)(7), including the First Amendment, the Religious Land Use and

18

Institutionalized Persons Act, and sections 42-4-32 and 42-5-2 of the Georgia Code. Cobb County, in contrast, has no power over training or discipline. *See Manders*, 338 F.3d at 1320–22. We conclude that, under Georgia law, the state controls the denial of an inmate's dietary request.

### 3. Source of Funds

The third factor is the source of funding for the function at issue. We concluded in *Manders* that when the county is required to pay by state law and the state provides some funding, this factor "tilt[s] . . . toward immunity." *Id.* at 1324. The application of this factor in this appeal is indistinguishable from the application in *Manders*, so we are bound to reach the same conclusion. The state pays for some of the operations of the sheriff's office, and the county "bears the major burden of funding [the sheriff's] office . . . because the State so mandates." *Id.* at 1323. Under *Manders*, this factor slightly favors immunity.

### 4. Responsibility for Adverse Judgments

The fourth factor looks to "the source of the funds that will pay any adverse judgment." *Id.* at 1324. In Georgia, counties are not liable for judgments against the sheriff in his official capacity, *id.* at 1326, and no law requires the state to pay an adverse judgment against a sheriff in his official capacity, *id.* at 1327. Instead, the sheriff "apparently would have to pay any adverse federal court judgment against him in his official capacity out of the budget of the sheriff's office," which

19

"implicate[s]" "both county and state funds." *Id.* But as we explained in *Manders*, the Supreme Court has "[n]ever . . . required an actual drain on the state treasury as a per se condition" of sovereign immunity. *Id.* And "the State's sovereignty and thus its integrity remain directly affected when federal court lawsuits interfere with a state program or function." *Id.* at 1329. For these reasons, we concluded that, "[a]t a minimum, this final factor does not defeat immunity." *Id.*

As with the third factor, the application of the fourth factor in this appeal is resolved by *Manders*. The sheriff apparently would pay for an adverse judgment against Major Skelton out of the sheriff's budget, but regardless of the effect on state finances, "an actual drain on the state treasury" is not required for immunity to apply under *Manders*. *Id.* at 1327. Under *Manders*, "this final factor does not defeat immunity." *Id.* at 1329.

### C.  Skelton Is Entitled to Sovereign Immunity.

Overall, the factors from *Manders* favor immunity. The first two factors strongly favor immunity: a deputy sheriff derives his powers and obligations from the sheriff, and "[s]heriffs' duties and functions are derived directly from the State, performed for the State, and controlled by the State." *Id.* at 1328. The third factor slightly favors immunity for the reasons stated in *Manders*, *see id.*, and the fourth factor "does not defeat immunity" for the reasons stated in *Manders*, *id.* at 1329.

20

We acknowledge that we reserved judgment in *Manders* about a "case of feeding . . . inmates, which necessarily occur[s] within the jail." *Id.* at 1319. But we also observed that Georgia law "regulates the preparation, service, and number of meals," which we called "evidence of how the duties of sheriffs in Georgia are governed by the State and not by county governing bodies." *Id.* at 1317 n.30. To the extent that our dissenting colleague suggests that this appeal should be decided based on "the Eleventh Amendment's twin reasons for being," Diss. Op. at 34 (quoting *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47 (1994)), we can only say that we are bound by the test of the en banc majority in *Manders*, not the dissent. *See Manders*, 338 F.3d at 1329–32 (Anderson, J., dissenting) (arguing for an approach based on the "Eleventh Amendment's twin reasons for being" (quoting *Hess*, 513 U.S. at 47)). And under the test announced in *Manders*, Major Skelton is entitled to immunity.

## IV. CONCLUSION

We **REVERSE** the denial of summary judgment against Lake's claims for damages and **REMAND** for further proceedings with an instruction to enter judgment in favor of Skelton on the claims for damages.

21

PARKER, Circuit Judge, dissenting:

In *Manders v. Lee*, this Court, applying a four part test, held that a Georgia sheriff acts as an arm of the State and is therefore entitled to Eleventh Amendment immunity when he establishes use-of-force policy at the county jail and trains and disciplines his deputies in that regard.  338 F.3d 1304 (11th Cir. 2003) (en banc) (6-5 decision).  The Court was careful to qualify, however, that it was not resolving whether a sheriff acts on behalf of the State for all purposes vis-à-vis the county jail, and it clearly distinguished the provision of food, clothing, and medical care to inmates on the ground that O.C.G.A. § 42-5-2 places the responsibility to furnish such necessities on the counties.  *See id.* at 1319, 1322–23 & n.43.

Notwithstanding those admonitions, the majority  holds that a Georgia deputy sheriff acts on behalf of the State and is thus immune from liability for failing to provide food to inmates in the county jail.  The majority reaches that conclusion based largely on its view that § 42-5-2 does not impose a duty on the counties, even though, as *Manders* recognized, the Georgia Court of Appeals has construed the statute to do just that.   The majority then proceeds to an inappropriate application of the *Manders* factors while losing sight of the principal purpose behind the Eleventh Amendment – not implicated here – of protecting the State's purse from federal-court judgments absent consent to suit.  The result is a decision that significantly expands the reach of sovereign immunity and will leave

22

Georgia counties unanswerable for constitutional violations predicated on their failure to provide food or any of the other necessities required by § 42-5-2. Because I believe that such an outcome is neither correct as a matter of law nor wise, I respectfully dissent.

The first factor under *Manders* asks how state law defines the entity with respect to the particular function. *Id.* at 1319. In *Manders*, the Court concluded that Georgia law defines the sheriff as a state actor with respect to force policy in the county jail because his authority to use force and his obligation to administer the jail "are directly derived from the state and not delegated through the county entity." *Id.* "While we must consider context," the Court continued, the fact that the actions took place within the county jail did not "automatically transmute" them into county functions because they involved "quintessential policing function[s]" that extended beyond the jail:

> [I]n administering the jail, the sheriff does not check his arrest powers or force authority at the door. Instead, he and his deputies bring them into the jail and exercise them in the jail setting. *This case is not a case of feeding, clothing, or providing medical care to inmates, which necessarily occur within the jail.* Instead, it involves Sheriff Peterson's force policy, which happens to be at issue in the jail context in this particular case.

*Id.* (emphasis added). The first factor thus weighed heavily in favor of immunity. *Id.*

Here, the particular function is the provision of food to inmates in the county jail.  As noted, that function is addressed in § 42-5-2, which provides that "it shall be the responsibility of the governmental unit, subdivision, or agency having the physical custody of an inmate to maintain the inmate, furnishing him with food, clothing, and any needed medical and hospital attention."  The Georgia Court of Appeals has long understood this section to require counties, as the governmental units having physical custody of inmates in the county jail, to ensure that they are provided with those necessities.  *See, e.g.*, *Tattnall County v. Armstrong*, 775 S.E.2d 573, 577 (2015) (en banc), *overruled on other grounds by Rivera v. Washington*, 784 S.E.2d 775 (Ga. 2016) ("OCGA § 42-5-2(a) imposes upon the county the duty and cost of medical care for inmates in its custody" at the county jail); *Epps v. Gwinnett County*, 499 S.E.2d 657, 663 (1998); *Cherokee County v. North Cobb Surgical Assocs., P.C.*, 471 S.E.2d 561, 563–64 (1996); *Macon-Bibb Cty. Hosp. Auth. v. Houston County*, 428 S.E.2d 374, 375–76 (1993).  Indeed, the Court of Appeals has specifically held that § 42-5-2 imposed a duty on Cobb County to provide medical care to inmates at the Cobb County Adult Detention Center.  *Graham v. Cobb County*, 730 S.E.2d 439, 440–41 (2012).  Relying on such decisions, the *Manders* court "stress[ed]" that it was not dealing with a case involving the denial of medical care, "which counties have a statutory obligation to provide to inmates in county jails."  338 F.3d at 1323 n.43; *see also Manders*, 338

24

F.3d at 1337 n.6 (Barkett, J., dissenting) ("The majority recognizes that counties may be liable for constitutional deprivations arising out of certain aspects of jail administration.") (citing 338 F.3d at 1322, 1323 & n.43).

Although the *Manders* court had no occasion to resolve whether Georgia law defines the sheriff as a state or county actor with respect to the provision of food to county jail inmates, the answer is apparent from its focus on delegation and context. Unlike the force policy, the responsibility of providing food falls directly on the county as the entity having physical custody over the inmates. While the sheriff is responsible for carrying that function out, he does so on the county's behalf as the county jailer, pursuant to a delegation of its responsibilities. *See* O.C.G.A. § 42-4-4 ("By virtue of their offices, sheriffs are jailers of the counties . . . ."). That is, after all, why the Georgia courts have held counties responsible under § 42-5-2 for the actions of the sheriff and his deputies in the county jail.[1] Further, unlike the force policy, which happened to be at issue in the jail context in

---

[1] In each of the cases cited to show that § 42-5-2 imposes a duty on the counties to furnish medical care to inmates in their physical custody, the allegations involved wrongdoing by the sheriff, his deputies, or both. Those decisions rest on the premise that inmates in county jails, while in one sense in the physical custody of the sheriff as the county jailer, *see* Maj. Op. at 12, are also in the physical custody of the county such that the county can be held responsible for the actions of the sheriff as its agent, *see Macon-Bibb Cty. Hosp. Auth. v. Reece*, 492 S.E.2d 292, 293 (Ga. Ct. App. 1997) (where plaintiffs sued county for medical expenses based on § 42-5-2, county's liability turned on "whether these detainees were in the physical custody of the county sheriff's department"). *Cf. Manders*, 338 F.3d at 1335 (Barkett, J., dissenting) ("As governmental units charged with the custody of persons accused of crimes, counties maintain their jails through the efforts of their sheriffs.").

25

*Manders* but commonly arises in other circumstances, the provision of food to inmates takes place almost exclusively within the jail.[2]  These two factors strongly suggest that state law defines the provision of food to inmates in the county jail as a county function.  They also explain why the Court in *Manders* was so insistent on distinguishing the provision of the necessities described in § 42-5-2 from the force policy, and why the Georgia federal district courts have overwhelmingly held that a sheriff performs a county function and is thus not entitled to immunity from liability for failing to provide medical care to inmates in the county jail.  *See Robinson v. Integrative Detention Health Servs., Inc.*, 2014 WL 1314947, at *12 & n.148 (M.D. Ga. Mar. 28, 2014) (collecting cases).

The majority appears to recognize that § 42-5-2, so read, presents a substantial obstacle to immunity.  But it concludes that because § 42-4-4(a)(1) "requires the sheriff to 'take . . . physical custody of the jail and the bodies of such persons as are confined therein,'" the sheriff is the "governmental unit" having physical custody of the inmates under § 42-5-2.  Maj. Op. at 12.  But this conclusion is foreclosed by Georgia law:  The Georgia Court of Appeals has construed § 42-5-2 to impose a responsibility on counties to provide food, clothing, and medical care to inmates in the county jail, which makes sense only if the

---

[2] I say almost exclusively because the Georgia courts have held that a person may be an "inmate" in the physical custody of the county even though he was not physically in the jail at the time of his injury.  *See, e.g.*, *North Cobb Surgical Assocs.*, 471 S.E.2d at 563–64.

26

counties are the "governmental units" upon whom that responsibility falls. Because I see no basis to conclude that the Georgia Supreme Court would interpret the statute differently, we are bound by the Court of Appeals's construction. *See Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1348 (11th Cir. 2011).

The majority offers two additional grounds for concluding that the first factor favors immunity, neither of which, in my view, is sufficient to overcome the force of the text of § 42-5-2. First, the majority cites § 42-4-32, which requires the sheriff to feed inmates and ensure that food preparation and service conform to state standards, and reasons that the imposition of such duties "directly on the sheriff . . . and not on the county in which the jail is located" is "evidence that the provision of food is a state function." Maj. Op. at 11. While I agree that § 42-4-32 places a duty on the sheriff to furnish food to inmates in his care, that does not tell us whether the sheriff acts on behalf of the State or the county when doing so. Section 42-5-2 does. Instead of construing § 42-4-32's silence to mean that the sheriff acts on behalf of the State, I would read the sections harmoniously to provide that the sheriff acts on behalf of the county. To the extent that doubt remains, context is again instructive: Because the function, with limited exceptions, occurs within the jail, the sheriff is best understood as acting on behalf of the county.

27

The majority also observes that "counties lack supervisory authority and 'delegate no powers or duties to sheriffs,'" and that Georgia courts have interpreted § 42-5-2 to require counties to fund the provision of medical care but give the sheriff exclusive control over selecting a provider. Maj. Op. at 13 (quoting *Manders*, 338 F.3d at 1319). Control, however, is addressed by the second factor: the first asks how state law defines the function, and under *Manders* that question is answered by considering delegation and context. *Cf. Manders*, 338 F.3d at 1319 n.35 ("The key question is not what arrest and force powers sheriffs have, but *for whom* sheriffs exercise that power."). The two factors should not be collapsed.[3] And while the *Manders* court did state that counties "delegate *no* powers or duties to sheriffs," the particular issue was whether they "delegate any *law enforcement* powers or duties to sheriffs," as the functions related to force policy. 338 F.3d at 1313 (emphases added). Outside of that specific context, *Manders* offers no guidance, and I would not read its dictum in a manner that conflicts with Georgia case law providing that § 42-5-2 imposes a duty on the counties that is carried out by sheriffs on their behalf.

---

[3] For the same reason, I fail to see the relevance of the principle of Georgia law that the powers of county commissioners are to be strictly limited and construed. *See* Maj. Op. at 15. The question for purposes of the first factor is not whether the county has authority or control over the sheriff's actions, but whether it bears responsibility for them.

28

In sum, because the task of providing food to inmates in the county's physical custody is assigned by statute to the county and is generally limited to the county jail, and because the alternative sources of state law do not clearly indicate that the sheriff acts for the State, I would hold that state law defines the function of providing food to inmates in the county's custody as a county function. Accordingly, I would find that the first factor weighs heavily against immunity.

Turning to the second factor – where state law vests control with respect to the particular function – I agree with the majority that the State's requirement in § 42-4-32(a) that food preparation and service conform to the Department of Public Health's standards, coupled with the counties' apparent lack of control, weighs in favor of immunity. Maj. Op. at 16–17. But control is of limited relevance to the Eleventh Amendment analysis where, as here, "[i]ndicators of immunity or the absence thereof do not . . . all point the same way," since "ultimate control of every state-created entity resides with the State" and "rendering control dispositive does not home in on the impetus for the Eleventh Amendment: the prevention of federal-court judgments that must be paid out of the State's treasury." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44, 47–48 (1994). That issue is instead addressed by the third and fourth *Manders* factors and the dual purposes underlying immunity, each of which, as I explain below, weighs against or at least does not favor immunity.

29

The third factor is the source of funding for the particular function at issue. In *Manders*, the Court observed that "[t]he State funds the annual training of sheriffs" and it was "reasonable to assume that such training includes instruction on force policy and hiring and training deputies." 338 F.3d at 1320, 1323. The State also funded "the Governor's disciplinary procedure over sheriffs for use of excessive force" and paid "for certain state offenders assigned to the county jails under the sheriff's supervision." *Id.* at 1323. The Court went on to note that although the county bore the "major burden of funding [the sheriff's office] and the jail, it [was] because the State so mandates," and the county lacked control over how the sheriff spent his budget. *Id.* Because the county did not exercise any power of the purse with respect to the particular functions and because "both state and county funds [were] involved" in those functions, the Court concluded that the State's involvement was "sufficient to tilt the third factor . . . toward immunity." *Id.* at 1324.

The majority determines that the application of the third factor is "indistinguishable from the application in *Manders*" because "[t]he state pays for some of the operations of the sheriff's office and the county bears the major burden of funding [the sheriff's] office . . . because the State so mandates." Maj. Op. at 19. I disagree. Under the majority's formulation, it is hard to imagine when this factor would not favor immunity, as the State always pays for some of a sheriff's

30

operations.  The *Manders* court took a more nuanced approach, focusing on the involvement of state funds in the particular functions relating to force policy, and found that the State's contributions to annual training, disciplinary procedure, and the housing of certain state offenders were enough to tilt the factor toward immunity.  Here, the State, through § 42-5-2, has expressly delegated to the counties the responsibility providing–by paying for–food to inmates. The absence of state funds for the particular function disfavors immunity.  *See, e.g.*, *Abusaid v. Hillsborough Cty. Bd. of Cty. Com'rs*, 405 F.3d 1298, 1310 (11th Cir. 2005).  It is presumably for this reason that in analyzing the third factor, the *Manders* court qualified that Manders "had not allege[d] that Sheriff Peterson denied him necessities in § 42-5-2" but rather had "challenged only Sheriff Peterson's force policy at the jail and the training and disciplining of his deputies."  338 F.3d at 1323 & n.43.[4]  Unlike Manders, Lake alleges precisely that.  I would therefore find that this factor tilts against immunity.

The fourth factor asks what is the source of the funds that would pay for an adverse judgment.  The majority, following *Manders*, concludes that "[a]t a

---

[4] I acknowledge that here, as in *Manders*, the State pays "for certain state offenders assigned to county jails under the sheriff's supervision."  338 F.3d at 1323.  However, because the Court rejected as too broad the dissent's characterization of the function as "jail operation," *id.* at 1309 n.9, the fact that the State also funded training and disciplining related to force policy was critical to the Court's analysis of the third factor, and comparable funding is absent in this case.  Were the State's mere payment for certain offenders assigned to the county jail enough to shift this factor toward immunity, the instruction that we assess the particular function – *the provision of food* to inmates in the county jail – would be rendered hollow.

minimum, this final factor does not defeat immunity," because although the State is not directly responsible for a judgment against the sheriff, any decrease in the sheriff's budget would indirectly impact both state and county funds, and "the State's sovereignty and thus its integrity remain directly affected when federal court lawsuits interfere with a state program or function." Maj. Op. at 20 (quoting *Manders*, 338 F.3d at 1329). Since *Manders*, however, the Court has twice rejected the theory that an indirect impact on the State treasury favors immunity and has instead held that "the fact that a judgment against the Sheriff in this case would *not* be paid out of the state treasury is, in itself, a clear marker that the Sheriff is not an arm of the state." *Abusaid*, 405 F.3d at 1313; *see also Pellitteri v. Prine*, 776 F.3d 777, 783 (11th Cir. 2015) ("[T]o the extent that the state treasury will be spared here from paying any adverse judgment, this factor weighs in favor of denying immunity.") (citing *Abusaid*, 405 F.3d at 1313).

Moreover, the *Manders* court itself ultimately relied not on the indirect-impact theory, but on the fact that lawsuits based on the sheriff's force policy would offend the State's dignity by interfering with what was, according to the remaining factors, a state function. *See* 338 F.3d at 1327–28 & n.51 (observing that "the United States Supreme Court has never said that the absence of a treasury factor alone defeats immunity and precludes consideration of other factors, such as how state law defines the entity or what degree of control the State has over the

32

entity," and that "[t]he State's 'integrity' is not limited to who foots the bill"). *Manders* is best read, therefore, to stand for the proposition that the absence of a direct impact on the State treasury does not preclude immunity where the remaining factors indicate that a state function is at issue. Here, because two of the remaining factors indicate that we are dealing with a county function and the other is of minimal relevance, this factor arguably tilts against immunity. In any event, as the majority acknowledges, this factor cannot support immunity. *See* Maj. Op. at 19–20.

To recapitulate, the first *Manders* factor weighs heavily against immunity. The third and possibly fourth point in the same direction. And while the second factor favors immunity, it is of limited relevance where the factors conflict. I would accordingly hold that a Georgia deputy sheriff is not entitled to immunity for failing to provide food to inmates in the county jail. This should come as little surprise, given the *Manders* court's repeated observation that the provision of food, clothing, and medical care are materially different for purposes of immunity from the force policy functions.[5]

---

[5] The extent of the majority's discussion on these statements is to "acknowledge that we reserved judgment in *Manders* about a 'case of feeding inmates, which necessarily occurs within the jail," but note that "we also observed that Georgia law 'regulates the preparation, service, and number of meals,' which we called 'evidence of how the duties of sheriffs in Georgia are governed by the State and not by county governing bodies.'" Maj. Op. at 21 (quoting *Manders*, 338 at 1317 n.30, 1319)) (alterations adopted). That statement, however, appeared in the Court's preliminary overview of Georgia law and was followed by the caveat that "[w]e do not contend

To the extent that the *Manders* factors are not conclusive, however, "the Eleventh Amendment's twin reasons for being remain our prime guide," *Hess*, 513 U.S. at 47, and they too weigh against immunity. The first factor is to ensure that we do not offend Georgia's dignity as a sovereign by allowing sheriffs to be sued in federal courts. *Id.* As noted, the Georgia Court of Appeals has held that a county is responsible for the sheriff's failure to comply with § 42-5-2 because the sheriff acts on the county's behalf, *i.e.*, as an arm of the county. *See supra* at 23–24. Indeed, while the Georgia courts have said that a county cannot be held liable for violating § 42-5-2 because the statute does not waive sovereign immunity as a matter of *state* law, they have added that "this does not mean that plaintiffs seeking recourse based on allegations that a government denied or provided inadequate medical treatment to an inmate are necessarily without recourse because such claims may in some circumstances state a cause of action under 42 U.S.C. § 1983." *Armstrong*, 775 S.E.2d at 578 n.10. Thus, not only do we *not* offend Georgia's dignity by permitting suit in these circumstances, Georgia *expects* that § 1983 liability would be available to hold sheriffs and counties accountable. "It would be

that these statutory jail duties, by themselves, transform sheriffs into state officials." 338 F.3d at 1317 n.30. Regardless, while § 42-4-32(a) shows that the State *controls* the function at issue, that is a quite different question from how the State *defines* the function, which is answered by § 42-5-2 and the context in which the function occurs. That is likely why, despite this single reference to § 42-4-32(a), the *Manders* court noted on four separate occasions that the case did not involve food, clothing, or medical care and thus did not implicate § 42-5-2.

34

every bit as much an affront to [Georgia's] dignity" to ignore those decisions and conclude that the sheriff and his deputies act for the State and are immune from liability for such actions. *See Fresenius Medical Care Cardiovascular Res., Inc. v. Puerto Rico & Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 63–66 (1st Cir. 2003).

The second purpose of immunity, which is the "most important," is to prevent federal-court judgments that would necessarily be paid out of the State's treasury absent consent to suit. *Hess*, 513 U.S. at 47–48. As *Manders* recognized, a federal judgment would have no direct impact on Georgia's treasury because it would be paid out of the budget of the sheriff's office, which as previously noted, comes from the county funds. 338 F.3d at 1327. While this fact does not necessarily defeat immunity, *e.g.*, *Pellitteri*, 776 F.3d at 782 n.2, it certainly weighs against it, *see Hess*, 513 U.S. at 51 (observing that "the Eleventh Amendment's core concern is not implicated" when "both legally and practically" the State is not "*in fact* obligated to bear and pay the resulting indebtedness of the enterprise") (emphasis added). And even if an indirect impact on the State treasury could theoretically support immunity, which is questionable, *see Abusaid*, 405 F.3d at 1312, that impact is too remote and speculative here because it is the counties who ultimately bear the responsibility for ensuring that the sheriff is adequately

35

funded to perform his duties. *E.g.*, *Chaffin v. Calhoun*, 415 S.E.2d 906, 907–08 (Ga. 1992). Both purposes, then, weigh against immunity.

For all of these reasons, I would hold that a Georgia deputy sheriff is not entitled to immunity from liability for failing to provide food to inmates at the county jail, and I would affirm the decision of the district court. I therefore respectfully dissent.